## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MATHEW RABADI, on behalf of himself and all )
others similarly situated, )
                                         )
                                         )
             Plaintiff, )     Civil Action No. _____
    vs. )
                                          )
DERMA SCIENCES, INC. STEPHEN T. )    **JURY TRIAL DEMANDED**
WILLS, SRINI CONJEEVARAM, BRETT D. )
HEWLETT, SAM NAVARRO, ROBERT G. )
MOUSSA, INTEGRA LIFESCIENCES )    **CLASS ACTION**
HOLDINGS CORPORATION, and INTEGRA )
DERMA, INC., )
                                          )
             Defendants. )
                                          )

## CLASS ACTION COMPLAINT

Plaintiff Mathew Rabadi ("Plaintiff"), by his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

1.      Plaintiff brings this stockholder class action on behalf of himself and all other public stockholder of Derma Sciences, Inc. ("Derma Sciences" or the "Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants") seeking equitable relief for their violations of Rule 14(e) promulgated under the Securities Exchange Act of 1934 ("Rule 14(e)"), and for their breaches of fiduciary duty arising out of the attempt to sell the Company to Integra Lifesciences Holdings Corporation and Integra Derma, Inc. (the "Merger Sub") (collectively "Integra"),  by means of an unfair process and for an unfair price (the "Proposed Acquisition" and/or "Merger").

2.     Under the terms of a definitive merger agreement announced on January 10, 2017 (the "Merger Agreement"), at the effective time, each share of the Company's common stock, issued and outstanding immediately prior to the effective time will be converted into the right to receive $7.00 per share in cash.  In addition, at the effective time each share of Derma Sciences' Series A Convertible Preferred Stock and Derma Sciences' Series B Preferred Stock will be converted into the right to receive $32.00 per share in cash and $48.00 per share in cash, respectively.  The Proposed Acquisition, which is structured as a tender offer, has a total approximate value of $204 million and is expected to complete the transaction in the first quarter of 2017.

3.     This consideration is unreasonably low and significantly undervalues the Company.

4.     Moreover, in addition the unreasonably low consideration contained in the Proposed Acquisition, the sales and negotiation process leading up to the Merger Agreement allowed for multiple preclusive deal protection mechanisms, which further call into question the fairness of the Proposed Acquisition.  Specifically, pursuant to the Merger Agreement, Defendants agreed to (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or providing them with pertinent confidential information; (ii) a notice provision that requires the Company to disclose confidential information about competing bids to Integra within twenty-four hours; (iii) a provision that provides Integra with the unfettered right to amend the Proposed Acquisition in response to a competing proposal; and (iv) a termination and expense fee provision that requires the Company to pay Integra $6.12 million in order to accept an alternative, superior offer.

5.     Compounding the harm associated with the Board's other breaches of fiduciary duty is its failure to disclose all material information to Derma Sciences' stockholders, which will

2

prevent them from making an informed decision with respect to the Proposed Acquisition. Specifically, on January 25, 2017, Derma Sciences filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Proxy Statement" and/or "Proxy") with the SEC in connection with the Proposed Acquisition.   The Proxy Statement, however, fails to provide the Company's stockholders with all material information concerning the Proposed Acquisition, thereby precluding them from making an informed decision regarding whether to tender their shares of Derma Sciences stock in favor of the Proposed Acquisition or making an informed decision as to whether they should elect to pursue an appraisal remedy.

6.      As alleged herein, the Individual Defendants have breached their fiduciary duties of loyalty and due care by, *inter alia*, agreeing to sell Derma Sciences' for inadequate consideration without ensuring that Plaintiff and Class members (defined below) would obtain adequate and fair consideration under the circumstances.  Derma Sciences, Integra and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duty.

7.      Plaintiff seeks to enjoin the Proposed Acquisition or, alternatively, to recover damages in the event that the Proposed Acquisition is consummated.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(e).  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.      Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper because Defendants reside, are found, have agents, and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

11.     This Court has personal jurisdiction over Defendants because they are located in, transacted business in, or had substantial contacts with this District.

### THE PARTIES

12.     Plaintiff Mathew Rabadi is, and has been at all relevant times a stockholder of Derma Sciences.  Plaintiff is a citizen of the state of Michigan.

13.     Derma Sciences is incorporated under the laws of the State of Delaware with its principal executive offices located at 214 Carnegie Center, Suite 300, Princeton, NJ 08540.  Derma Sciences operates as a medical device company in the wound care market.  The Company markets its products to acute care, extended care, home health care, nursing homes, hospitals, wound and burn care clinics and physician offices through direct sales force, independent distributors, and manufacturers representatives.  Derma Sciences' common stock is traded on the NasdaqCM under the symbol "DSCI."

14.     Defendant Stephen T. Wills ("Wills") has been a director of the Company at all relevant times.  In addition, Wills serves as the Interim Executive Chairman and Principal Executive Officer of the Company.

15.     Defendant Srini Conjeevaram ("Conjeevaram") has been a director of the Company at all relevant times.  In addition, Conjeevaram serves as the Chair of the Board's Audit Committee, as a member on the Board's Compensation and Nominating and Corporate Governance Committees, and is listed as a "financial expert" by the Company.

16.     Defendant Brett D. Hewlett ("Hewlett") has been a director of the Company at all relevant times.  In addition, Hewlett serves as a member on the Board's Nominating and Corporate Governance Committee.

17.     Defendant Sam Navarro ("Navarro") has been a director of the Company at all relevant times.  In addition, Navarro serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member on the Board's Audit and Compensation Committees.

18.     Defendant Robert G. Moussa ("Moussa") has been a director of the Company at all relevant times.  In addition, Moussa serves as the Chair of the Board's Compensation Committee and as a member on the Board's Audit and Nominating and Corporate Governance Committees.

19.     Individual Defendants Wills, Conjeevaram, Hewlett, Navarro, and Moussa are, and at all times relevant hereto have been, directors of Derma Sciences, and are referred to herein as "Individual Defendants" or "Director Defendants."

20.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the company's stockholders.

21.     Defendant Integra is a Delaware corporation with its principal place of business located at 311 Enterprise Drive, Plainsboro, NJ 08536.  Integra develops, manufactures, and markets surgical implants and medical instruments for use in neurosurgery, extremity reconstruction, orthopedics, and general surgery.  Integra is publicly traded on the NasdaqGS under the ticker symbol "IART."

22.     Defendant Merger Sub is a Delaware corporation who can be served care of its registered agent, Corporation Service Company, at Corporation Trust Center, 2711 Centerville

Rd., Suite 400, Wilmington, DE 19808. Merger Sub is a wholly owned subsidiary of Integra created for the execution and consummation of the Proposed Acquisition.

## SUBSTANTIVE ALLEGATIONS

*Derma Sciences Background*

23.     Derma Sciences operates as a medical device company in the wound care market.

24.     The Company's Advanced Wound Care segment offers MEDIHONEY dressings for managing non-chronic and hard-to-heal wounds, including chronic ulcers, burns, and post-operative wounds; TCC-EZ system for patients with diabetic foot ulcers; AMNIOEXCEL for tissue repair, reconstruction, and replacement; and AMNIOMATRIX that is used as a wound covering in the treatment of localized tissue defects. This segment also provides XTRASORB dressings, which convert fluid within the dressings to a gel and lock the exudates into the dressings; BIOGUARD dressings for prophylactic use in the prevention of hospital or community acquired infections through wound sites; ALGICELL AG antimicrobial dressings; and occlusive dressings, such as hydrocolloids, foams, hydrogels, alginates, additional silver antimicrobial dressings, cleansers, and DERMAGRAN products.

25.     Additionally, Derma Sciences' Traditional Wound Care segment offers gauze sponges and bandages, non-adherent impregnated dressings, retention devices, paste bandages, and other compression devices; adhesive bandages and related first aid products; private-label wound care products; wound closure strips, nasal tube fasteners, and catheter fasteners; and general purpose and specialized skin care products.

26.     Derma Sciences markets its products to acute care, extended care, home health care, nursing homes, hospitals, wound and burn care clinics and physician offices through direct sales force, independent distributors, and manufacturers representatives.

27.     Derma Sciences has a long history of financial success, as evidenced in its recent financial results for Q3 of 2016, which were released on November 10, 2016.  Notably, the Company saw several key financial metrics rise sharply from the same time last year, including net sales which shot up 22.6% year-on-year, and gross profit percentage which increased more than nine points from 41.0% to 49.1% from the same time last year.

28.     Further news of import from this period included the Company completing a sale of its low-margin First Aid Division (along with inventory) for $9.7 million in cash and a $2.7 million promissory note.  Simultaneously the Company completed an acquisition of BioD, LLC ("BioD"), significantly bolstering the Company's more successful Advanced Wound Care Segment and allowing the Company to raise $2.3 million from certain BioD members and employees

29.     This quick sale and acquisition furthered the Company's future goals of strengthening its more successful Advanced Would Care Segment, and was instrumental in providing for a more secure and solid financial future for Derma Sciences.

30.     Speaking on this tremendously positive financial quarter for the Company, Defendant Wills commented, "The third quarter was an exceptionally busy and productive time for Derma Sciences. We sold our lower-margin FAD business, which provided upfront cash of $9.7 million, to invest in our AWC growth strategy. In acquiring BioD we became a leading manufacturer and marketer of birth tissue products for use in surgical procedures and wound care."

31.     Wills went on further to say, that the Company's "gross profit expanded substantially" during this quarter.

32.     More specifically, Russell Olsen, president of the Company's Advanced Wound Care segment shared examples of the segments recent success noting that, "...through the first nine

months of the year, compared to the same period in 2015. AMNIOEXCEL sales are up 33% in the U.S., TCC-EZ is enjoying an 18% growth in the U.S. and MEDIHONEY is up 13% in Europe. In addition, Surgical Solutions sales have experienced significant growth of 38%, driven primarily in the areas of sports medicine and ophthalmology."

33.     Derma Sciences' recent financial success is not an aberration, but rather the most recent evidence of an upward and stable financial trend.  For example in Derma Sciences' Q2 2016 financial results, released on August 9, 2016, the Company reported an increase in the Advanced Wound Care segment's net sales of 6.6% year-on-year and a $7 million uptick in net income from continuing operations year-on-year.

34.     Additionally, the Company announced its product AMNIOEXCEL® as eligible for reimbursement by Medicare Administrative Contractor ("MAC") CGS in six of the eight MAC regions.  Furthermore, during this time the Company raised $7.6 million in cash through a sale of Company held equity holdings in Comvita Limited.

35.     Speaking on these positive results Defendant Wills stated, "I am extremely pleased with the direction of our company and with our recent progress," further noting that the Company had "a very good quarter."

36.     The Company's financial results for Q1 2016, which were released on May 11, 2016, showcases further evidence of the Derma Sciences' financial success.  For example, the results note that the Advanced Wound Care Segment's net sales increased by 8.5% year-on-year, with total net sales and gross profit also up year-on-year – 3.8% and 2.3% respectively.

37.     Speaking on these positive result, Defendant Wills commented on these results and other positive developments for the Company's product lines stating, "The first quarter and recent weeks brought a great deal of good news, which we expect will have a positive impact on our

business," and continuing, "WPS Government Health Administrators, a MAC serving states primarily in the Midwest, and CGS Administrators, a MAC serving Kentucky and Ohio, are now permitting coverage of AMNIOEXCEL®. This brings our national coverage to 86% of Medicare Part B beneficiaries and should help accelerate sales of this important wound care product."

38.   Despite Derma Sciences' clear and continuous record performance, and the fact that it now stands on the verge of enjoying exponential growth as it fully realizes recent acquisitions and the streamlining of its profitable Advanced Wound Care Segment, the Individual Defendants, aided and abetted by Derma Sciences, Integra and Merger Sub, have determined to foreclose from Plaintiff and other public stockholders of the Company any chance at enjoying these future upsides by selling the Company to Integra for the insufficient and unreasonable merger consideration

***The Flawed Process***

39.   The Company first began exploring potential strategic alternatives during the fourth quarter of 2015, at which time the Company engaged Greenhill & Co., LLC ("Greenhill") to assist the Company in evaluating a range of potential strategic alternatives.

40.   During this time the Company entered into confidentiality agreements with ten potential strategic parties and began preliminary discussions with those parties.  Of those ten parties, the Company received indications of interest from eight.

41.   During this time former Company Chief Executive Officer ("CEO") Edward J. Quilty called Integra President and CEO Peter J. Arduini to inquire if Integra would be interested in a strategic transaction between the two companies.  An in person follow-up meeting was scheduled for December 2015, but was subsequently canceled after the public announcement that Mr. Quilty was no longer serving as Company CEO.

42.     Throughout the first three quarters of 2016 the Derma Sciences Board, along with Greenhill met and discussed the various indications of interests which had been submitted and determined that all but two (submitted by companies labeled "Party D" and "Party E") did not provide an appropriate valuation of the Company.

43.     During June and August 2016 both Party D and Party E submitted updated indications of interest.  Party E would later again revise its offer in October 2016.

44.     In September 2016, Defendant Wills was contacted by Integra's General Counsel, who indicated that Integra CEO Arduini was interested in discussing a possible transaction.  After subsequent discussions Derma Sciences and Integra entered into a confidentiality agreement on October 13, 2016.

45.     Also on October 13, 2016, the Company entered into a confidentiality agreement with a Company labeled as "Party F" who expressed interest in a potential transaction. Additionally in October 2016, a Company expressing interest in a transaction described as "Party G" contacted the Board.  However, neither Party F nor Party G's interest in the Company progressed beyond a preliminary indication of interest, and neither party submitted a bid.

46.     On November 1, 2016, Party E submitted a bid valuing the company between $140.7 and $171.0 million and requested exclusivity in negotiations moving forward.

47.     On November 14, 2016, Integra officers met with Defendant Wills and submitted a non-binding indication of interest valuing the Company between $6.00 and $6.50 per share in a proposed cash and stock deal.  At this time Integra also requested exclusivity in negotiations moving forward.

48.     After discussion with Greenhill, the Board determined to continue discussions with both Parte E and Integra and not grant exclusivity to either party.

49.     Throughout November 2016 the Derma Sciences Board continued discussion with both Integra and Party E, including engaging in preliminary due diligence with both, during which Wills represented to Integra that exclusivity could only be granted if the price per share offered by Integra reached at least $7.00 per share.

50.     On December 7, 2016, the Company received a revised non-binding indication of interest from Integra with a price range of $6.75 to $7.00 per Company share.  At this time Integra also sent to the Derma Sciences Board a draft of an exclusivity agreement and indicated that any continued discussions would require the entry into such an agreement on behalf of the Company.

51.     The Company Board appraised Party E of Integra's new proposal and indicated that unless Party E was willing to increase the valuation of their most recent proposal they would enter into the exclusivity agreement with Parent.

52.     On December 8, 2016, the Company Board met with Greenhill and the Company legal advisor to discuss the sales process.  Defendant Wills noted that, based on previous discussions with Party E, that Party E was not going to meet its net sales budget for 2016 and was approximately 15% below projections it had provided to the Company.  Based on this information the Company Board approved the exclusivity agreement with Integra.

53.     Throughout December 2016 and early January 2017 the Derma Board and Integra engaged in discussions and due diligence regarding a proposed transaction, aided by legal and financial advisors.

54.     On January 9, 2017, the Galen Partnerships, which own approximately 84.03% of the total shares of Company Series A Preferred stock and approximately 95.16% of the total shares of outstanding Company Series B Preferred Stock, executed a letter agreement agreeing to tender their shares in favor of the proposed tender offer.

55.    On January 10, 2017, after discussion with Greenhill, the Company Board approved the Proposed Acquisition.

56.    On January 25, 2017, Integra commenced the tender offer.

**The Proposed Acquisition**

57.    On January 10, 2017, Integra announced the Proposed Acquisition.   The press release states in relevant part:

> **Plainsboro, New Jersey, January 10, 2016 (GLOBE NEWSWIRE)** — Integra LifeSciences Holdings Corporation (Nasdaq:IART), a global leader in medical technology, announced today that it has signed a definitive agreement to acquire Derma Sciences Inc. (Nasdaq:DSCI) for a price of $7.00 per share of Derma Sciences common stock in cash.
>
> "Derma Sciences' amniotic tissue-based platform technology further broadens Integra's regenerative technology capabilities and builds upon our 3x3 wound care strategy," said Peter Arduini, Integra's president and chief executive officer. "The addition of a complementary portfolio of wound care products, including an amniotic product with reimbursement in the wound care channel, allows us to further drive scale in the advanced wound care market."
>
> Under the agreement, Integra will commence a tender offer to purchase all of the outstanding shares of Derma Sciences common stock for $7.00 per share in cash. Integra will also offer to purchase the outstanding shares of Derma Sciences preferred stock for an amount equal to its liquidation preference per share. The tender offer will be followed by a merger of Derma Sciences with a newly formed subsidiary of Integra. The companies expect to complete the transaction at the end of the first quarter of 2017, subject to customary closing conditions, including U.S. antitrust clearance and the tender of a majority of outstanding shares of Derma Sciences common stock and preferred stock. Integra expects to use its existing credit facility to finance the transaction.
>
> BofA Merrill Lynch acted as exclusive financial advisor and Latham & Watkins LLP acted as legal advisor to Integra

58.    The announcement of the Proposed Acquisition by Integra was reflected in a January 17, 2017, 8-K filing by Derma Sciences, which states, in relevant part:

> **Item 1.01.    Entry into a Material Definitive Agreement.**

On January 10, 2017, Derma Sciences Inc., a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Integra LifeSciences Holdings Corporation, a Delaware corporation ("Integra"), and Integra Derma, Inc., a newly formed, indirect wholly-owned subsidiary of Integra ("Merger Sub"), pursuant to which Merger Sub will commence a tender offer (the "Offer") to purchase any and all of the issued and outstanding shares of:

(i)     the Company's common stock, par value $0.01 per share (the "Company Shares"), at a price per Company Share of $7.00;

(ii)     the Company's Series A Convertible Preferred Stock, par value $0.01 per share, of the Company (the "Series A Preferred Stock"), at a price per share of Series A Preferred Stock of $32.00, which represents the Series A Liquidation Preference per share of Series A Preferred Stock; and

(iii)     the Company's Series B Convertible Preferred Stock, par value $0.01 per share, of the Company (the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Company Preferred Stock"), at a price per share of Series B Preferred Stock of $48.00, which represents the Series B Liquidation Preference per share of Series B Preferred Stock, in each case, payable net to the seller in cash, without interest, subject to any withholding of taxes required by applicable law, on the terms and subject to the conditions set forth in the Merger Agreement.

Pursuant to the Merger Agreement, Merger Sub has agreed to commence the Offer as promptly as reasonably practicable (but in no event later than 10 business days) after the date of the Merger Agreement.

The Merger Agreement provides that the Company may not solicit or support any alterative acquisition proposals (subject to customary exceptions for the Company's Board of Directors to respond to unsolicited proposals or intervening events in the exercise of its fiduciary duties). In addition, in connection with the termination of the Merger Agreement in certain circumstances, the Company will be obligated to pay a termination fee of $6,120,000 and/or reimburse Integra for up to $1,500,000 in certain expenses Integra incurred in connection with the transactions contemplated by the Merger Agreement.

The closing of the Offer is subject to various conditions, including there being validly tendered in the Offer (in the aggregate) and not properly withdrawn prior to the expiration of the Offer: (i) that number of Company Shares and shares of Company Preferred Stock that equals at least a majority in voting power of the Company Shares and shares of Company Preferred Stock then issued and outstanding, voting together as a single class, (ii) that number of shares of Series A Preferred Stock that equals at least a majority of the shares of Series A Preferred Stock then issued and outstanding, and (iii) that number of shares of Series B

Preferred Stock that equals at least a majority of the shares of Series B Preferred Stock then issued and outstanding.

As soon as practicable following the acceptance by Merger Sub of the Company Shares and the Company Preferred Stock in the Offer, Merger Sub will be merged with and into the Company, with the Company continuing as the surviving corporation (the "Merger") on the terms and subject to the conditions set forth in the Merger Agreement, with the Merger to be effected pursuant to Section 251(h) of the General Corporation Law of the State of Delaware, as amended (the "DGCL"). As a result of, and at the effective time of the Merger (the "Effective Time"), each Company Share or share of Company Preferred Stock not purchased in the Offer (other than any Company Shares or Company Preferred Stock for which the holder has properly demanded the appraisal of such shares pursuant to the DGCL) will be converted into the right to receive a cash amount, without interest, subject to any withholding of taxes required by applicable law, equal to the applicable Offer Price (as defined in the Merger Agreement) for such Company Shares and Company Preferred Stock.

At the Effective Time, subject to the terms and conditions set forth in the Merger Agreement, each stock option to purchase Company Shares (an "Option") and each restricted stock unit award (an "RSU") of the Company that is outstanding immediately prior to the Effective Time that is vested as of the Effective Time in accordance with its terms, will automatically be cancelled and converted into the right to receive a cash amount equal to the product of (i) the total number of Company Shares subject to such Option or RSU and (ii) (a) in the case of any such Option, the excess (if any) of $7.00 (the "Per Share Merger Consideration") over the per-share exercise price of such Option, and (b) with respect to any such RSU, the Per Share Merger Consideration.

At the Effective Time, subject to the terms and conditions set forth in the Merger Agreement, each Option and each RSU of the Company that is outstanding immediately prior to the Effective Time that does not become vested as of the Effective Time in accordance with its terms (and that is not forfeited as of the Effective Time in accordance with its terms), will automatically be converted into an option or restricted stock unit (as applicable) relating to shares of Integra's common stock and will generally be subject to the same terms and conditions as were applicable to each such Option or RSU immediately prior to the Effective Time, the number, and (with respect to Options only) the exercise price, of which will be determined in accordance with the adjustment mechanisms set forth in the Merger Agreement.

The Merger Agreement has been included to provide investors and stockholders with information regarding its terms. Except for its status as a contractual document that establishes and governs the legal relations among the parties thereto with respect to the transactions described herein, the Merger Agreement is not intended

to provide any other factual, business or operations information about the Company.

The Merger Agreement contains representations and warranties that the parties to the Agreement made to and solely for the benefit of each other. The assertions embodied in such representations and warranties are qualified by information contained in the confidential disclosure schedules that the Company delivered in connection with signing the Merger Agreement. Accordingly, investors and stockholders should not rely on such representations and warranties as characterizations of the actual state of facts or circumstances, since they were only made as of the date of the Merger Agreement and are modified in important part by the underlying disclosure schedules. The information concerning the subject matter of such representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures.

Pursuant to the terms of the Merger Agreement, the Offer and the Merger are subject to certain other customary closing conditions, including, but not limited to, the receipt of regulatory clearances, the continued accuracy of the representations of the Company and the absence of a material adverse effect with respect to the Company.

The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is attached as Exhibit 2.1 to this Current Report on Form 8-K (this "Form 8-K") and is incorporated herein by reference.

### The Inadequate Merger Consideration

59.     As set forth herein, the Company's recent financial performance, position as a leader in its industry, valuable operating divisions, future growth prospects, and synergistic benefits to Integra all establish the Merger consideration to be unfair and inadequate if Derma Sciences' stockholders are to have their equity in the Company extinguished as is contemplated by the Proposed Acquisition.

60.     Pursuant to the terms of the Agreement, the Proposed Acquisition values shares of Derma Sciences' common stock at $7.00 per share.  Significantly, the Company has traded as high as $8.77 per share on April 16, 2015, approximately 25.29% above the consideration offered in the Proposed Acquisition.

61.     Additionally, at least one financial analyst firm, Roth Capital Markets, issued a recent price target for the Company significantly higher than the valuation offered in the Proposed Acquisition, rating the Company as high as $8.50 per share in August 2016, a value that is approximately 21.43% greater than that included in the Proposed Acquisition.

62.     Moreover, following the announcement of the Proposed Acquisition, Derma Sciences also announced that it had purchased the MEDIHONEY® brand and related intellectual property and goodwill from its long-term partner, Comvita Limited.  Prior to this purchase, the Company held the exclusive global license for the MEDIHONEY® brand; the Purchase eliminates Derma Sciences' obligation of royalty payments to Comvita for future sales of MEDIHONEY® products, a cost which amounted to $1.6 million in 2016.

63.     According to Defendant Wills, MEDIHONEY® brand products have grown to be "the largest line of medical-grade honey products for advanced wound care use in the world, totaling global sales of approximately $20.0 million in 2016." This intellectual property purchase is therefore likely to result in large future profits for the Company, however the timing of the purchase, coming only after the announcement of the Proposed Acquisition is highly suspect, and it is clear that the future value of this intellectual property acquisition may be not properly included in the consideration offered to the Plaintiff and other public stockholders of Derma Sciences.

64.     Moreover, Integra stands to benefit greatly from the synergies offered in the Proposed Acquisition, as evidenced by Integra President and Chief Executive Officer Peter Arduini's statements in the Merger Announcement categorizing Derma Sciences as having a "complementary portfolio" to Integra.  Mr. Arduini went on further to state that the addition of Derma Sciences' wound care products would allow Integra to "...further drive scale in advanced wound care market."

65.     Also speaking on these synergistic benefits was Defendant Wills, who was quoted in a January 11, 2017, *The Street* article as stating, "Derma's portfolio of biologics and advanced wound care products are a natural extension of Integra's business, and with Integra's global presence, our products will reach a much larger and broader set of clinicians and patients."

66.     Clearly, despite Integra receiving a boon in synergistic benefits due to the Proposed Acquisition, it has not translated into a fair price for Plaintiff and other Derma Sciences stockholders.

67.     Based on the above, the Proposed Acquisition will allow Integra to purchase Derma Sciences at an unfairly low price while availing itself of Derma Sciences' significant value and upside or long-term potential.

***Insiders Receive Special Benefits from the Proposed Acquisition***

68.     Certain of the Individual Defendants and Derma Sciences' senior executives stand to benefit from the Proposed Acquisition in ways that are not shared equally with Plaintiff and the Class.  Upon closing of the transaction, Derma Sciences' common stock will cease to be publicly traded and the Company will be a wholly-owned independent subsidiary of Integra.  As such, Individual Defendants and other Company insiders will be able to exchange large, illiquid, blocks of Company shares they currently hold for cash.  As noted in the Proxy,  Company insiders, including all Individual Defendants, own large, illiquid blocks of Company shares that will be translated into millions of dollars of cash as follows:

| Name | Number of Company Shares Owned | Cash Consideration Payable in Respect of Company Shares | |
|---|---|---|---|
| Stephen T. Wills | 119,201 | $ | 834,407 |
| Srini Conjeevaram | 63,942 | $ | 447,594 |
| Robert G. Moussa | 63,896 | $ | 447,272 |
| Brett D. Hewlett | 33,750 | $ | 236,250 |
| Samuel E. Navarro | 12,500 | $ | 87,500 |
| John E. Yetter | 55,631 | $ | 389,417 |
| Robert C. Cole | 68,985 | $ | 482,895 |
| Frederic Eigner | 47,074 | $ | 329,518 |

| | | |
|---|---|---|
| **Total** | **464,979** | **$ 3,254,853** |

69.     Additionally, pursuant to the Merger Agreement, at the Effective Time of the Merger, each outstanding and unvested Company option, RSU, and/or PSU will automatically vest and/or be converted into the right to receive the Merger consideration.  If the Proposed Acquisition is consummated, these Company insiders will receive immediate lump sum cash payments in exchange for their thousands of currently illiquid Derma Sciences options.

70.     Certain Company insiders, including Individual Defendants Wills, Conjeevaram, Moussa, and Hewlett hold thousands of dollars worth of currently illiquid Company options as follows:

| Name | Number of Currently Unvested Single-Trigger Company Options[1] | Number of Currently Vested Single-Trigger Company Options[1] | Total Number of Company Shares Subject to Single-Trigger Company Options[1] | Weighted Average Exercise Price Per Single-Trigger Company Option[2] | Total Cash Consideration for Single-Trigger Company Options |
|---|---|---|---|---|---|
| Stephen T. Wills | 0 | 33,750 | 33,750[3] | $  4.55 | $  82,700[3] |
| Srini Conjeevaram | 0 | 13,750 | 13,750[4] | $  4.81 | $  30,050[4] |
| Robert G. Moussa | 0 | 21,750 | 21,750[5] | $  4.57 | $  52,850[5] |
| Brett D. Hewlett | 0 | 20,000 | 20,000[6] | $  5.12 | $  37,600[6] |
| Samuel E. Navarro | 0 | 0 | 0 | N/A | N/A |
| John E. Yetter | 33,000 | 62,657 | 95,657[7] | $  4.21 | $  266,884[7] |
| Robert C. Cole | 33,000 | 62,657 | 95,657[8] | $  4.21 | $  266,884[8] |
| Frederic Eigner | 33,000 | 62,657 | 95,657[9] | $  4.21 | $  266,884[9] |
| **Total** | **99,000** | **277,221** | **376,221** | **—** | **$ 1,003,852** |

[1]   These columns include only those Single-Trigger Company Options with exercise prices less than the Company Share Offer Price (collectively, the "In-the-Money STCOs") and do not include any Single-Trigger Company Options with an exercise price equal to or greater than the Company Share Offer Price (collectively, the "Out-of-the-Money STCOs"), which Out-of-the-Money STCOs will be cancelled at the Effective Time for no consideration pursuant to the terms of the Merger Agreement. For In-the-Money STCOs, (a) the "Number of Currently Unvested Single-Trigger Company Options" column includes those In-the-Money STCOs that are, as of the date hereof, unvested but that will vest as a result of the Transactions and (b) the "Number of Currently Vested Single-Trigger Company Options" column includes those In-the-Money STCOs that are vested prior to the Transactions and are unexercised.

[2]   The "Weighted Average Exercise Price Per Single-Trigger Company Option" column includes weighted average exercise prices only for In-the-Money STCOs.

[3]   Total does not include 33,875 Out-of-the-Money STCOs held by Mr. Wills. As a result, total cash consideration reflects consideration only for those 33,750 In-the-Money STCOs held by Mr. Wills.

[4]   Total does not include 15,375 Out-of-the-Money STCOs held by Mr. Conjeevaram. As a result, total cash consideration reflects consideration only for those 13,750 In-the-Money STCOs held by Mr. Conjeevaram.

 (5) Total does not include 15,375 Out-of-the-Money STCOs held by Mr. Moussa. As a result, total cash consideration reflects consideration only for those 21,750 In-the-Money STCOs held by Mr. Moussa.

 (6) Total does not include 11,000 Out-of-the-Money STCOs held by Mr. Hewlett. As a result, total cash consideration reflects consideration only for those 20,000 In-the-Money STCOs held by Mr. Hewlett.

 (7) Total does not include 100,500 Out-of-the-Money STCOs held by Mr. Yetter. As a result, total cash consideration reflects consideration only for those 95,657 In-the-Money STCOs held by Mr. Yetter.

 (8) Total does not include 100,700 Out-of-the-Money STCOs held by Mr. Cole. As a result, total cash consideration reflects consideration only for those 95,657 In-the-Money STCOs held by Mr. Cole.

 (9) Total does not include 100,200 Out-of-the-Money STCOs held by Mr. Eigner. As a result, total cash consideration reflects consideration only for those 95,657 In-the-Money STCOs held by Mr. Eigner.

71. Certain Company insiders, including all of the named Individual Defendants hold thousands of dollars worth of currently illiquid Company RSUs as follows:

| Name | Number of Single-Trigger Company RSUs | Cash Consideration for Single-Trigger Company RSUs | |
|---|---|---|---|
| Stephen T. Wills | 27,500 | $ | 192,500 |
| Srini Conjeevaram | 17,500 | $ | 122,500 |
| Robert G. Moussa | 17,500 | $ | 122,500 |
| Brett D. Hewlett | 17,500 | $ | 122,500 |
| Samuel E. Navarro | 25,000 | $ | 175,000 |
| John E. Yetter | 8,000 | $ | 56,000 |
| Robert C. Cole | 8,000 | $ | 56,000 |
| Frederic Eigner | 8,000 | $ | 56,000 |
| **Total** | **129,000** | **$** | **903,000** |

72. In addition, pursuant to the severance agreements between the Company and several of its senior executives and corporate officers, several Company insiders, such as, will be entitled to certain payments and other benefits in the event the participant's employment is terminated by Derma Sciences without cause, such as due to a change in control as predicated by the Proposed Acquisition.  These severance packages, including severance compensation of terms of base pay and benefits, are further benefits in which Plaintiff and other public stockholders of the Company will not share.

73. Finally, on January 24, 2017, the Company released an 8-K granting Defendant Wills a transaction bonus of up to $1,200,000, a transaction bonus pool of $750,000 to other executive and management team members of the company, and bonuses of up to $450,000 to non-

executive board members.  These bonuses, coming in the waning hours of the ownership of Derma Sciences stock by Plaintiff and other public stockholders is a final sour note to a transaction that saw the Individual Defendants put personal profit ahead of promoting stockholder interest.

74.     In sum, Derma Sciences' senior executive officers, and all Individual Defendants, will receive millions of dollars in the form of special and unique compensation upon the consummation of the Merger.  Thus, the Proposed Acquisition is marred by a substantial conflict of interest and calls into question the Company's motives for entering into the Proposed Acquisition.

***Preclusive Deal Mechanisms***

75.     The Merger Agreement contains certain provisions that unfairly favor Integra by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination payment provision that requires Derma Sciences to pay $6,120,000.00 to Integra if the Merger Agreement is terminated under certain circumstances.  For instance, under one scenario, Derma Sciences must pay this fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.

76.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to Derma Sciences stockholders.

77.     Furthermore, the Merger Agreement also contains a "no solicitation" provision that restricts Derma Sciences from considering alternative acquisition proposals by, *inter alia*, constraining Derma Sciences' ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from soliciting any alternative

proposal after a brief defined time period, but permits the Board to consider a "*bona fide written Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

78.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide Integra information in order to match any other offer, agreeing to provide Integra access to the unsolicited bidder's financial information within twenty-four hours of any competing bid, and giving Integra the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Integra.

79.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition and the Proposed Acquisition is the product of the Board's breaches of fiduciary duty, aided and abetted by Derma Sciences, Integra and Merger Sub.

**The Proxy Statement Omits Material Information**

80.     Finally, the Company has attempted to induce shareholder support for the Proposed Acquisition by filing a materially false and/or misleading Proxy Statement, filed on January 25, 2017 with the Securities and Exchange Commission.

81.     Significantly, the Proxy Statement omits or misrepresents material information necessary for Plaintiff and other public stockholders of Derma Sciences to make an informed decision regarding whether to tender their shares of Company stock in favor of the Proposed Acquisition.

82.     Specifically, the Proxy Statement fails to provide, or provides materially false information to, Derma Sciences stockholders with respect to: (a) the financial projections provided to, or prepared by, the management of the respective parties to the Proposed Acquisition and their

advisors; (b) the financial valuation analyses prepared by Derma Sciences' Financial Advisor, Greenhill in connection with its rendering of a fairness opinion on which the Board purportedly relied upon; and (c) the flawed sales process leading up to the Proposed Acquisition.

83.     The Proxy Statement fails to provide, or provides materially misleading information regarding the financial projections provided to, or prepared by, the management of the respective parties to the Proposed Acquisition and their advisors, including:

    a.  Revenue
    b.  R&D
    c.  G&A
    d.  Sales and marketing
    e.  EBITDA
    f.  D&A
    g.  Taxes (or tax rate)
    h.  Capital expenditures
    i.  Changes in net working capital
    j.  Stock-based compensation expense
    k.  Transaction benefits

84.     The Proxy Statement also contains numerous misstatements, ambiguities, or omissions regarding the financial valuation analyses prepared by the Financial Advisor in connection with rendering fairness opinions on which the Board purportedly relied upon, as well as their specific duties and roles in the process, including:

**Selected Publicly Traded Companies Analysis –** (14D-9 at 28-29)

    i.  The individual 2016-2018 EV/Sales multiples of each of the selected public companies analyzed by Greenhill.

    ii.  The individual EV/LTM revenue multiples of each of the "peer index" by Greenhill.

    iii.  Why Tissue Regenix Group plc was not included in the peer index.

    iv.  Did Greenhill perform any type of benchmarking analyses for Derma Sciences in relation to the selected public companies?

    v.  Why Greenhill did not utilize the Company Investment Case forecasts in this analysis.

**Sum-of-the-Parts Analysis** (14D-9 at 30)

   i.   The discount rate and the individual inputs and assumptions utilized by Greenhill for the analysis to derive the discount rate range.

   ii.   How did Greenhill treat stock-based compensation expense in its analysis (i.e. as a cash expense or a non-cash expense)?

**Discounted Cash Flow Analysis** (14D-9 at 30)

   i.   The individual inputs and assumptions utilized by Greenhill to derive the discount rate range of 13.0% - 15.0%.

   ii.   How did Greenhill treat stock-based compensation expense in its analysis (i.e. as a cash expense or a non-cash expense)?

**Selected Precedent Transactions Analyses** (14D-9 at 31-32)

   i.   The individual multiples for each of the selected transactions analyzed by Greenhill.

   ii.   Did Greenhill perform any type of benchmarking analyses for Derma Sciences in relation to the target companies?

   iii.   The transaction amount for each of the selected transactions.

85.    The Proxy Statement contained material misstatements and otherwise failed to disclose material information about the flawed sales process leading up to the Proposed Acquisition, including:

   a.   If Party E was given a price point in comparison to its offer at which the Company would enter into an exclusivity agreement with Party E;

   b.   If the MEDIHONEY intellectual property acquisition by the Company, announced shortly after the Proposed Acquisition was entered into, was discussed between the Company and Integra; and

   c.   Whether any potential value that the MEDIHONEY intellectual property acquisition announced by the Company was incorporated into the projections used in Greenhill's financial analyses.

86.    The information most important to public stockholders in an acquisition is that underlying or supporting the valuation given to their shares by the potential acquirer. Stockholders are entitled to this information, and must use it as a foundation for an informed decision on whether

to cast a tender their shares of Company stock in favor of the Proposed Acquisition. By providing false or materially misleading information, or omitting such information entirely, the Defendants here have hamstrung the Plaintiff and other public stockholders of Derma Sciences from exercising their rights as stockholders, and potentially forcing them to tender their shares of Company stock in favor of a merger which will rob them of the value of their investment. In doing so the Defendants have breached their fiduciary duties owed to the Plaintiff and other public stockholders of the Company.

87. Plaintiff and other members of the Class have no adequate remedy at law.

## CLASS ACTION ALLEGATIONS

88. Plaintiff brings this action individually and as a class action on behalf of all holders of Derma Sciences' common stock who are being and will be harmed by the Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant

89. This action is properly maintainable as a class action because, *inter alia*:

(a) The Class is so numerous that joinder of all members is impracticable. Derma Sciences' stock is publicly traded on the NasdaqCM and upon information and belief, Plaintiff believes that there are hundreds if not thousands of holders of such shares. Moreover, the holders of these shares are geographically dispersed throughout the United States;

(b) There are questions of law and fact which are common to the Class including, *inter alia*: (i) whether the Individual Defendants have breached their fiduciary duties to plaintiff and the Class by conducting an unreasonable sales process and agreeing to an acquisition transaction at a price that is inadequate and is not the fair value that could be obtained under the circumstances; (ii) whether Derma Sciences, Integra and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and (iii) whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants;

(c) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the Class and

Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST COUNT

### Breach of Fiduciary Duty against the Individual Defendants

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     As alleged herein, Defendants have agreed to sell Derma Sciences for inadequate consideration under the circumstances.  The Individual Defendants are privy to non-public information concerning the Company that the public stock stockholders are not; thus, there exists a fiduciary duty to protect these stockholders and ensure the cash out process entails both fair dealing and a fair price.  Defendants have failed to sufficiently inform themselves of Derma Sciences' value, or have disregarded the true value of the Company.  Furthermore, the Individual Defendants have agreed to onerous deal protection devices that discourage any alternate acquirer from coming forward in the face of the knowledge that Integra can block the purchase.

92.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and

25

will further a process that inhibits the maximization of stockholders value and the disclosure of material information.

93.     Plaintiff and the members of the Class have no adequate remedy at law.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty
### Against the Derma Sciences, Integra and Merger Sub

94.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

95.     Derma Sciences, Integra and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Acquisition, Integra and Merger Sub secured certain deal protection provisions that unfairly inhibit the advancement of alternative proposals.   In addition, Integra obtained sensitive non-public information concerning Derma Sciences' operations and thus had the advantage to acquire the Company at an unfair price.

96.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

97.     Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD COUNT

### Class Claims Against Derma Sciences and the Individual Defendants

### Violations of Rule 14(e) Promulgated Under The Securities Exchange Act Of 1934

98.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.     The Individual Defendants have issued the Proxy Statement with the intention of soliciting stockholder support of the Merger.

100.    Defendants violated Section 14(e) of the Exchange Act by issuing a Proxy Statement that was materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

101.    Defendants knew that Plaintiff would rely upon their statements in the Proxy Statement in determining whether to tender his shares in favor of the Proposed Acquisition.

102.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision

whether to tender his shares in favor of the Proposed Acquisition if such misrepresentations and omissions are not corrected prior to the close of the tender offer period.

103.    Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## FOURTH COUNT

### Class Claims Against the Individual Defendants

### For Violations of Section 20(a) of the Exchange Act

104.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Derma Sciences stockholders.

105.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

106.    The Individual Defendants acted as controlling persons of Derma Sciences within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Derma Sciences, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

107.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Proxy Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

109.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

110.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

111.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.     Temporarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

C.     To the extent the Proposed Acquisition is consummated before entry of this Court's judgment, rescinding it and setting it aside or awarding rescissory damages;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

Dated: January 30, 2017                **BRODSKY & SMITH, LLC**

*/s/ Evan J. Smith*
Evan J. Smith
Marc L. Ackerman
1040 Kings Highway N., Ste. 650
Cherry Hill, NJ 08034
Tel.:   (856) 795-725
Fax:    (856) 795-1799
Email: esmith@brodskysmith.com
          mackerman@brodskysmith.com

*Counsel for Plaintiff*